1
2
3
4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    SAINT DEJUAN MOORE,                    Case No. 14-cv-05637-JSC

8              Plaintiff,

9         v.                               **ORDER ON DEFENDANTS' MOTIONS
                                           FOR SUMMARY JUDGMENT**
10   THE CITY OF OAKLAND, et al.,
                                           Re: Dkt. Nos. 64, 69
11             Defendants.

12

13        This case arises out of the arrest and prosecution of Plaintiff Saint Dejuan Moore following

14   a fatal traffic accident during a police chase.  In the Third Amended Complaint ("TAC"), Plaintiff

15   alleges that Defendants California Highway Patrol ("CHP") Officer Sean Deise and City of

16   Oakland Police Department ("OPD") Officer Daniel Tirapelli falsely identified Plaintiff as the

17   driver of the car.  He alleges that Officer Deise is liable under 42 U.S.C. § 1983 for subjecting him

18   to false arrest and that both officers are liable for malicious prosecution for murder and other

19   charges resulting from the collision.  Plaintiff further alleges that the City of Oakland is liable for

20   its failure to train its officers to conduct criminal investigations to prevent malicious prosecution.

21   (*See* Dkt. No. 44.)  Defendants now move for summary judgment on all of Plaintiffs' claims.

22   (Dkt. No. 64, 69.)  Upon careful consideration of the parties' submissions, the entire record of this

23   case, and the arguments of counsel at a hearing held on February 23, 2017, the Court GRANTS

24   Defendants' motions as set forth below.

25                              **SUMMARY JUDGMENT EVIDENCE**

26   I.    **The Initial Car Chase, Collision & Arrest**

27        On December 27, 2012 at around 11:20 p.m., CHP Officer Sean Deise and his partner were

28   on patrol in Oakland.  (Dkt. No. 66 ¶ 2.)  The officers were performing a traffic stop on the

United States District Court
Northern District of California

northbound side of 90th Avenue when they saw a silver BMW with no license plates speed past them in the southbound lane—both violations of the California Vehicle Code.  (*Id.* ¶ 2.)  The officers finished their traffic stop then got back in their car to stop the BMW.  (*Id.* ¶ 3.)  Officer Deise made a U-turn so the officers were directly behind the BMW and activated the police car's lights to signal the BMW to stop.  (*Id.*)  The BMW pulled over.  (*Id.*)  As Officer Deise and his partner got out of their car, the BMW accelerated and made a U-turn.  (*Id.* ¶ 4.)  When the rear wheels began to spin out during the U-turn, the BMW slowed down to regain control.  (*Id.*; *see also* Dkt. No. 65-2 at 49.)

There is no dispute that Plaintiff—who had been smoking marijuana and drinking that evening—was in the BMW wearing a black jacket.  (*See* Dkt. No. 65-2 at 4-5; Dkt. No. 65-10.)  But the parties dispute what Officer Deise saw when the car drove past him.  Officer Deise avers that he had a "clear and unobstructed view into" the driver's side window, which was about 10-15 feet away from him, and that he saw a black male adult with short black hair wearing black rimmed glasses and a black jacket or sweatshirt driving the car.  (*Id.*)  He did not notice if anyone was in the passenger seat.  (*Id.*)  But Plaintiff testified that he was asleep in the passenger seat when the BMW made the U-turn.  (Dkt. No. 65-2 at 20-21.)  He further testified it would have been impossible for Officer Deise to notice anything about the driver at that time because it was too fast, too dark, and the angle did not permit observation.  (*Id.* at 52-53.)  Plaintiff has also submitted the declaration of private investigator Timothy J. O'Brien in support of his contention that Officer Deise could not have seen enough about the driver to identify him.  (Dkt. No. 71-2.)

In any event, it is undisputed that the BMW then drove off in the northbound lane of 90th Avenue.  (*Id.* ¶ 4.)  The officers made a U-turn to follow the BMW and called into dispatch to report the car.  (*Id.* ¶ 5.)  As the BMW sped away, it failed to stop at a number of stop signs.  (*Id.*)  Going even faster—Officer Deise estimated that it was going 60 mph in a 30-mph zone—the BMW turned right onto MacArthur Boulevard then left onto 98th Avenue, when an Oakland Police Department vehicle joined the chase.  (*Id.* ¶ 6.)  Officer Deise lost sight of the BMW after watching it fail to stop at a red light on 98th Avenue.  (*Id.* ¶¶ 6-7.)

After cresting a hill at 98th Avenue and reaching the on-ramp to the 580 freeway at Las

2

United States District Court
Northern District of California

1    Vegas Street (*see* Dkt. No. 69-2 ¶ 4; Dkt. No. 69-2 at 15), Officer Deise saw that the BMW had

2    been involved in a traffic collision: there was heavy damage to the front of the car, which came to

3    rest on the concrete median.  (*Id.* ¶ 7.)  A passenger in the car that the BMW struck died as a result

4    of the collision.  (Dkt. No. 69-2 ¶ 3.)  Officer Deise watched two black men run from the driver's

5    side of the BMW to the northwest towards Las Vegas Avenue; the man closest to the driver's side

6    wore jeans, a black jacket or sweatshirt, and sneakers, and the other wore jeans and a white t-shirt.

7    (Dkt. No. 66 ¶ 7.)  Plaintiff admits that he exited the BMW on the driver's side wearing a black

8    jacket.  (Dkt. No. 65-2 at 25, 29, 54-55.)

9          Officer Deise stopped the car on Las Vegas Avenue, and he and his partner searched the

10   area on foot.  (Dkt. No. 69-2 ¶ 8.)  Officer Deise found Plaintiff hiding behind a house; "[b]ased

11   on his facial features and black jacket," Officer Deise identified Plaintiff as the man he had

12   observed driving the BMW as it passed him during the U-turn, so he brought Plaintiff into

13   custody.  (*Id.*)  Plaintiff contends that Officer Deise lied when he identified him as the driver at

14   that time and at all points going forward.  (Dkt. No. 65-2 at 41-42.)  As the Court must draw all

15   factual conflicts in Plaintiff's favor, it must assume that Plaintiff was not the driver and thus that

16   Officer Deise was either mistaken when he stated he observed Plaintiff in the driver seat or lied

17   when he identified him as such.

18         Plaintiff told Officer Deise that his glasses were still in the BMW and he needed them.

19   (*Id.*; Dkt. No. 65-2 at 36, 38.)  After Officer Deise read Plaintiff his rights and placed Plaintiff in

20   the backseat of the CHP patrol car, Plaintiff repeatedly stated that he was not driving the BMW

21   and was asleep in the passenger seat.  (Dkt. No. 69-2 ¶ 9; Dkt. No. 65-2 at 36-39.)  He told Officer

22   Deise that he ran from the car because he was on probation.  (Dkt. No. 65-2 at 38-40; Dkt. No. 65-

23   2 at 55; Dkt. No. 65-3 (Plea and Probation Documents for 2011 Felony Conviction).[1])  Plaintiff

24

25   [1] Officer Deise requests that the Court take judicial notice of three documents filed in connection
     with his motion for summary judgment.  (Dkt. No. 67.)  Exhibit C to the declaration of Rohit
26   Kodical is a copy of Plaintiff's Plea and Probation Documents regarding his prior felony
     conviction for violating Health and Safety Code § 11359 relating to Alameda County Superior
27   Court Case No. 165421.  (Dkt. No. 65-3.)  Exhibit E are the felony complaints that the Alameda
     County District Attorney's Office filed against Plaintiff in April and October 2013 relating to the
28   December 2012 collision—*i.e.*, the allegedly malicious prosecution at issue in this case.  (Dkt. No.
     65-5.)  Exhibit H is the Superior Court's Order Holding to Answer and Commitment regarding the

also volunteered to the officer that he had been drinking alcohol and smoking marijuana that day; Officer Deise smelled marijuana and alcohol on Plaintiff and noticed signs of intoxication, and an alcohol screening indicated that his blood alcohol content was .025%.  (*Id.* ¶ 10.)

Plaintiff was taken into custody, and the police never found the second man in the car. (Dkt. No. 74-2 at 5.)

## II.        The Investigation & Prosecution

Although CHP Officer Deise was the arresting officer, OPD took over the investigation. OPD Officer Daniel Tirapelli, now retired, was on duty as Acting Sergeant in the Traffic Investigation Unit in December 2012.  (Dkt. No. 65-1 at 2; Dkt. No. 69-2 ¶ 2; *id.* at 15.)  Officer Tirapelli responded to the accident scene at around 3:00 a.m. and became the on-scene supervisor. (*Id.* ¶ 4.)  Officer Tirapelli—who has experience investigating over 100 fatal collisions— conducted the investigation the way he normally did: he looked at the evidence, directed the technician to take photographs and process the car for evidence, searched the car for proof of identification, and fingerprinted and swabbed the car for DNA.  (*Id.* ¶ 5.)  Officer Tirapelli also had the technician remove the airbags.  (*Id.*)

Back at the police station, Officer Tirapelli and his partner interviewed Plaintiff—who arrived at the police station following a hospital visit to address his injuries from the collision— after reading him his *Miranda* rights.  (Dkt. No. 69-2 ¶¶ 6-7.)  Officer Tirapelli wrote a Narrative Report describing the incident.  (Dkt. No. 65-1 at 2-12.)  According to the report, Plaintiff told the officers that he understood he had been identified as the driver, but he was not the driver, did not know who the driver was, and had never seen him before.  (Dkt. No. 65-1 at 4-5; Dkt. No. 69-2 ¶ 7.)  The report reflects that Plaintiff told the officers that an older man at the bar whose name he did not know had arranged the ride for him because Plaintiff realized he was in danger of violating his parole curfew.  (Dkt. No. 65-1 at 4-5; Dkt. No. 65-2 at 6, 8-9; Dkt. No. 69-2 ¶ 7.)  He repeated

---

felony charges against Plaintiff connected with the December 2012 collision.  (Dkt. No. 65-8.)  A "court may take judicial notice of court filings and matters of public record," *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006), including court records in underlying criminal cases.  *See United States v. Howard*, 381 F.3d 873, 876 n.1 (9th Cir. 2004).  Accordingly, the Court GRANTS Officer Deise's request for judicial notice.

as much at his deposition in this case.  (Dkt. No. 65-2 at 7.)  Plaintiff testified that he told the man who called the ride for him where he was going, and that man must have told the driver his address.  (Dkt. No. 65-2 at 12, 15.)  According to Officer Tirapelli's narrative report and Plaintiff's deposition testimony, Plaintiff said that had never seen the BMW or its driver before, did not have a conversation with the driver, looked at the driver for less than ten seconds when he got in the car before falling asleep, did not know what the driver was wearing, and described the driver as a "light-skinned male black, 24 – 34 years old, clean cut."  (Dkt. No. 65-1 at 5; *see also* Dkt. No. 65-2 at 15-16, 19, 22, 62.)

Plaintiff told the officers and testified at his deposition that he fell asleep in the car on the way home and only woke up when the car did a "donut[,]" at which point Plaintiff turned around and saw the police car with sirens on following them.  (Dkt. No. 65-1 at 4-5; Dkt. No. 65-2 at 8, 19 (testifying that he woke up when "the car jerks and I hear skidding" and the police are behind him); *id.* at 20 ("I didn't wake up until the car did the U-turn and passed by [the officers]."); *id.* at 49 (testifying that a "fishtail burning rubber" that woke him up).)  According to Plaintiff, he asked the driver to let him out of the car, but the driver did not let him.[2]  (Dkt. No. 65-1 at 5; Dkt. No. 65-2 at 22.)

Plaintiff testified at his deposition that he exited on the driver's side because he had taken his seatbelt off when he saw the police behind him so he could get out and run, so when the collision happened he slid in front of the seat beneath the dashboard and wiggled free when he saw the open door, not knowing if the door on his side was still able to open after the collision.  (Dkt. No. 65-2 at 25, 29, 54-55.)  His glasses flew off his face at the time of the collision and he did not stop to put them on because he needed to run from the police.  (*Id.* at 29-30.)

Officer Tirapelli, then a 25-year veteran of OPD with significant interviewing experience, did not believe Plaintiff's story.  (*Id.* ¶ 8.)  Based on Officer Deise's identification, Plaintiff's admission that he had been in the car, and Plaintiff's glasses found in the car, Officer Tirapelli

---

[2] Plaintiff reportedly told the officers that the driver did not respond until after the collision, saying "get out if you can!"  (Dkt. No. 65-1 at 5; *see also* Dkt. No. 65-2 at 24-25.)  But at his deposition, Plaintiff testified that the driver responded earlier, refusing to let Plaintiff out of the car.  (Dkt. No. 65-2 at 23.)

United States District Court
Northern District of California

recommended charging Plaintiff with a probation violation, driving under the influence, evading a police officer, duty to stop at a scene of an accident, and gross vehicular manslaughter while intoxicated.  (Dkt. No. 65-1 at 10-12;Dkt. No. 69-2 ¶ 9.)  OPD arrested Plaintiff for vehicular manslaughter under California Penal Code § 192(c)(1), causing serious bodily injury during flight from a peace officer under California Vehicle Code § 2800.3, failing to stop at the scene of an accident resulting in injury under California Vehicle Code § 20001, and driving under the influence of alcohol under Vehicle Code § 23153.  (Dkt. No. 65-4 at 2.)  Plaintiff was taken to Santa Rita jail where he spent the next 17 months.  (Dkt. No. 69-2 ¶ 10; Dkt. No. 44 ¶ 16.)

In April 2013 the Alameda County District Attorney charged Plaintiff with murder and four other felonies related to causing injury while evading officers and leaving the scene of the collision.  (Dkt. No. 65-6 at 2-6.)  The District Attorney amended the complaint to add another felony evasion count in October 2013.  (*Id.* at 7-11.)

Officer Tirapelli did not immediately request DNA testing of the evidence taken from the scene of the accident.  (*See* Dkt. No. 69-2 ¶¶ 12, 19.)  According to Officer Tirapelli, that was consistent with his usual practice: he frequently did not immediately request DNA testing from traffic accidents because it would take about three months to get results because homicides are given priority.  (*Id.* ¶ 12.)  He averred that this case would have been treated like a traffic accident even though there was a fatality.  (*Id.*)  In late summer 2013, the Deputy District Attorney assigned to the case asked Officer Tirapelli to have the DNA evidence processed.  (Dkt. No. 69-2 ¶ 13.)  Based on the DA's request, Officer Tirapelli submitted the DNA evidence for testing.  (*Id.* ¶¶ 13, 19.)

At some point, the police learned that the BMW was registered to Joshua Ford, an alias for Elton Flenaugh, who Plaintiff concedes is his uncle.  (Dkt. No. 65-2 at 17-18.)  Mr. Flenaugh is a black man who was 33 years old at the time of the collision.  (Dkt. No. 64 at 10 n.1.)  Plaintiff testified that he first learned that Mr. Flenaugh owned the BMW during discovery in his criminal case.  (Dkt. No. 65-2 at 26.)  When asked whether Mr. Flenaugh might have been driving the BMW, Plaintiff noted that it was possible that the man inside the bar had called Mr. Flenaugh to pick up Plaintiff, but stated that he was not in touch with Mr. Flenaugh at the time of the collision

and did not know who the driver was, adding that "[i]f I tell you it was [Mr. Flenaugh], then I would have to tell you I [saw Mr. Flenaugh] driving the car." (Dkt. No. 65-2 at 27.)

Plaintiff had a preliminary hearing in Alameda County Superior Court on October 29, 2013. (Dkt. No. 65-6 at 2; Dkt. No. 69-2 ¶ 14.) The Superior Court had previously granted Plaintiff's attorney's request to continue the preliminary hearing to allow time to receive the results of the DNA analysis, but the presiding judge eventually let the preliminary hearing go forward without the DNA results because the Deputy District Attorney was not introducing DNA evidence at the hearing. (*See* Dkt. No. 69-1 at 7-8; *see also* Dkt. No. 65-2 at 59.) Officer Deise testified that he was 90 to 95 percent certain that Plaintiff was driving the BMW. (Dkt. No. 74-2 at 4-6.) He noted that he has a heightened sense of awareness during a pursuit, which contributed to his confidence about the identification. (*Id.* at 6.) Aside from his testimony at the preliminary hearing, Officer Deise was not involved in Plaintiff's prosecution. (Dkt. No. 66 ¶ 12.) Plaintiff insists that Officer Deise was lying at his preliminary hearing, highlighting an inconsistency about whether the officer called dispatch to report one black male or two running from the car, and otherwise stating that the officer must have been lying because it was more than merely a mistaken identification. (Dkt. No. 65-2 at 41-47.)

Officer Tirapelli also testified at the preliminary hearing. (Dkt. No. 69-2 ¶ 14; *id.* at 11-44.) He described the evidence he collected at the scene and his search to determine the owner of the car; he was not asked and did not testify about any DNA analysis. (*See id.*) He avers that, "[t]o the best of [his] knowledge, the results of the DNA analysis had not yet been returned by the lab." (*Id.* ¶ 14.) Plaintiff concedes that Officer Tirapelli testified truthfully. (Dkt. No. 69-1 at 20-21.)

Ultimately, the judge held Plaintiff to answer on all charges, finding probable cause to believe he was the driver despite agreeing that there was "certainly some room to question the accuracy of the officer's identification, given the brevity of the observation and the somewhat equivocal testimony on some other points[.]" (Dkt. No. 65-6 at 10-11; *see also* Dkt. No. 65-7 at 2 (order holding Plaintiff to answer).) On November 8, 2013, the District Attorney filed a Criminal Information against Plaintiff as to the same six felony counts—one count of murder and five

counts relating to evasion and leaving the scene of an accident after causing injuries.  (Dkt. No. 65-8.)

In late November or early December 2013 Officer Tirapelli received the DNA results from the lab by interoffice mail.  (Dkt. No. 69-2 ¶ 15.)  He forwarded a copy to the Deputy District Attorney.  (*Id.*)  The lab analyzed the airbags and the glasses from the BMW.  (*See* Dkt. No. 69-2 at 32.)  The test results did not implicate Plaintiff.[3]  (Dkt. No. 69-2 ¶ 15; *id.* at 35.)

The Deputy District Attorney requested to have the DNA reprocessed.  (Dkt. No. 69-2 ¶ 16.)  In December 2013 or January 2014, Officer Tirapelli submitted a request to have all available DNA evidence tested—not just the airbags included in the first DNA analysis, but the steering wheel, gear shifter, center console, and driver and passenger head rests and arms.  (*Id.* ¶ 16; *id.* at 39.)  The District Attorney's investigator also obtained a DNA sample from Plaintiff for the purposes of comparison in the lab.  (*Id.* ¶ 16.)

Officer Tirapelli and the Deputy District Attorney received the results of the second DNA analysis on May 10, 2014.  (*Id.* ¶ 17.)  The results did not implicate Plaintiff.  (*Id.*; *id.* at 39-44.)  On May 15, 2014, the Deputy District Attorney advised Officer Tirapelli that he had dropped all charges against Plaintiff the prior week due to the results of the second DNA test.  (*Id.* ¶ 18.)  Plaintiff was released from custody on May 9, 2014.  (Dkt. No. 44 ¶ 16.)

Plaintiff filed this action in December 2014.  (Dkt. No. 1.)  As Plaintiff proceeded in forma pauperis, the Court reviewed the complaint under 28 U.S.C. § 1915 and dismissed it with leave to amend several times.[4]  (Dkt. No. 9.)  In December 2015, the Court reviewed and ordered service of the Third Amended Complaint on all Defendants.  (Dkt. No. 48.)  Defendants moved for summary judgment at the close of discovery.  (Dkt. Nos. 64, 69.)  Following oral argument, at the Court's instruction the parties filed supplemental briefing further addressing probable cause and

---

[3] Plaintiff contends that the DNA results confirmed that he was not, in fact, the driver of the BMW, but Officer Deise argues that the results were merely inconclusive as to Plaintiff—*i.e.*, that there was not enough DNA material to reach a conclusion.  (*See* Dkt. No. 64 at 19.)  Drawing all inferences in Plaintiff's favor, the Court assumes for the purposes of this motion that the DNA analysis established Plaintiff's factual innocence and confirmed that he was not the driver.

[4] Although Plaintiff proceeded in forma pauperis, he has been represented by counsel since this lawsuit began.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  qualified immunity.  (Dkt. Nos. 75, 76, 77.)

2                                    **DISCUSSION**

3          Defendants move for summary judgment on all of Plaintiff's claims.  In his oppositions,

4  Plaintiff dismisses or withdraws a number of claims.  Specifically, he abandons the false arrest

5  claim against Officer Deise (Dkt. No. 71 at 7), the malicious prosecution claim against Officer

6  Tirapelli, and the municipal liability claim against the City of Oakland (Dkt. No. 70 at 6).  The

7  Court therefore dismisses these claims.  As there are no remaining claims against the City of

8  Oakland, the Court dismisses the City from this action.

9          The Section 1983 claims at issue include a claim of delayed DNA testing against Officer

10 Tirapelli and a malicious prosecution claim against Officer Deise.  To prevail on his remaining

11 Section 1983 claims, Plaintiff must show that the alleged conduct both occurred "under color of

12 state law" and deprived Plaintiff of a constitutional or federal statutory right.  *S. Cal. Gas Co. v.*

13 *City of Santa Ana*, 336 F.3d 85, 887 (9th Cir. 2003).  The first element is met, as the claims arise

14 out of defendants' actions in their role as police officers who act under color of state law.  Thus,

15 the only question before the Court is whether there are any constitutional violations.

16 **II.     Delayed DNA Testing Claim against Officer Tirapelli**

17         A.      *Whether Plaintiff can Bring a Due Process Claim for Delayed DNA Testing*

18         In the TAC, Plaintiff brought a malicious prosecution claim against Officer Tirapelli.

19 (Dkt. No. 44 ¶¶ 28-34.)  The gravamen of the claim was that Officer Tirapelli "deliberately

20 ignored the DNA evidence that existed from the steering wheel of the car in which the Plaintiff

21 was a passenger that would have immediately proven that Plaintiff was not the driver of the car."

22 (*Id.* ¶ 29.)  Plaintiff alleged that Officer Tirapelli acted with the scienter required to state a

23 plausible malicious prosecution claim because "he knew that there existed exculpatory DNA

24 evidence that in fact established a lack of probable cause to prosecute Plaintiff for murder" but

25 "deliberately ignor[ed]" it during his criminal investigation.  (*Id.* ¶¶ 32, 34.)  In his opposition to

26 Officer Tirapelli's motion, Plaintiff abandons the malicious prosecution claim and argues instead

27 that Officer Tirapelli is "liable for failing to conduct a DNA test of the apparently exculpatory

28 evidence from December 2012 to November 2013" in violation of Plaintiff's right to due process.

1    (Dkt. No. 70 at 4 (emphasis omitted).)

2         A plaintiff may bring Section 1983 claims in the same action based on both malicious

3    prosecution as well as any other federal rights allegedly violated.  *See Awabdy v. City of Adelanto*,

4    368 F.3d 1062, 1072 (9th Cir. 2004).  A claim for failure to preserve potentially exculpatory

5    evidence can constitute a due process violation where the plaintiff can establish bad faith on the

6    part of the police.  *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *United States v. Cooper*,

7    983 F.2d 928, 933 (1993).  But it is a different claim from the malicious prosecution claim alleged

8    in the TAC.  Thus, rather than oppose the City Defendants' motion on its merits, Plaintiff attempts

9    to rewrite the TAC by asserting a new claim.  When appropriate, courts deem new claims in an

10   opposition to a motion for summary judgment as a motion to amend the pleadings under Federal

11   Rule of Civil procedure 15(b).  *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir.

12   2014) (citing *Apache Survival Coal. v. United States*, 21 F.3d 895, 910 (9th Cir. 1994)).  And

13   indeed, here Plaintiff invokes Rule 15 and urges the Court to consider the claim.  (*See* Dkt. No. 70

14   at 5.)  Courts take five factors into account to determine whether to grant leave to amend: bad

15   faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the

16   plaintiff has previously amended the complaint."  *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th

17   Cir. 2004).

18        There is no evidence of bad faith.  But there has been undue delay: Plaintiff initiated this

19   action in 2014 and the underlying facts have remained the same since then.  This is not a case in

20   which Plaintiff did not understand the facts giving rise to the newly alleged claim until late in

21   discovery.  *Cf. Desertrain*, 754 F.3d at 1154.  To the contrary, Plaintiff's initial complaint alleged

22   that "[a]fter over a year of confinement in jail, DNA tests confirmed that the Plaintiff was not

23   driving" the car.  (Dkt. No. 1 ¶ 10.)  In his opposition, Plaintiff merely asserts the claim and thus

24   does not offer any explanation for the undue delay.  Further, Plaintiff has already amended the

25   complaint three times, and did not raise a due process claim for failure to preserve or test DNA

26   evidence in any iteration of the pleadings.  (*See* Dkt. Nos. 1, 10, 22, 44.)

27        On the other hand, despite the undue delay, there is no prejudice to Officer Tirapelli.  Since

28   filing his initial complaint Plaintiff has challenged Officer Tirapelli's failure to have the DNA

United States District Court
Northern District of California

evidence tested.  Thus, the DNA testing claim comes as no surprise to the officer.  The same discovery underlying the other claims is relevant.  Indeed, Officer Tirapelli actually addressed the failure to test DNA in his motion for summary judgment.  Thus, there is no prejudice, and Officer Tirapelli does not argue otherwise.  (Dkt. No. 73 at 4.)

Finally, Officer Tirapelli contends that leave to amend would be futile because "any delay in testing potentially exculpatory evidence in this case is not a due process violation."  (*Id.* at 4.) In his view, Plaintiff's allegations that Officer Tirapelli failed to conduct a DNA test until Plaintiff was in custody for nearly a year does not state a due process claim.  (*Id.* at 2-3.)  Failure to preserve potentially useful evidence—which could include possible DNA evidence—does not constitute a denial of due process unless the plaintiff can show bad faith on the part of the police. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  In that context, the bad faith "requires some intent to withhold evidence that may have value to the defense."  *Story v. Martel*, No. 10-CV-00566-LHK, 2011 WL 90112, at *12 (N.D. Cal. Jan. 10, 2011); *see also Phillips v. Woodford*, 267 F.3d 966, 987 (9th Cir. 2001) (in the post-conviction context, finding no due process violation where the petitioner failed to show that the state destroyed the evidence to prevent disclosure of it favorable to the defense).  Plaintiff cites no authority establishing an obligation of the police to test DNA evidence in advance of a preliminary hearing or even trial.  Indeed, in *Youngblood* the Supreme Court noted that the "police do not have a constitutional duty to perform any particular tests." *Id.* at 59.

In *Nicolaas v. Pace*, No. C12-1357RAJ, 2013 WL 4519603, at *3 (W.D. Wash. Aug. 26, 2013), the plaintiff brought a due process claim for failure to test DNA evidence to corroborate an eyewitness identification.  There, the court noted that "[s]o far as [it] is aware, no court has entertained the notion that police *must* test DNA evidence."  *Id.* (emphasis in original).  The court continued to note that if the police perform tests and the results are exculpatory, a prosecutor has a constitutional obligation under *Brady v. Maryland*, 373 U.S. 83 (1963) to disclose the results, but "[n]either *Brady* nor any other precedent of which the court is aware requires DNA tests."  *Id.* Further, "[a]t least one appellate court has squarely rejected the notion that a defendant can require the government to investigate a case as the defendant prefers."  *Id.* (citing *United States v. Tadros*,

United States District Court
Northern District of California

310 F.3d 999, 1005 (7th Cir. 2002)).  But the *Nicolaas* court did not hold that a plaintiff could never bring a due process claim for failure to test DNA evidence.  Instead, it noted it "does not purport to decide that police *never* have the obligation to test DNA evidence; it decides only that they had no obligation in this case" because there was no evidence of bad faith on the part of the police.  *Id.* at *4.  The court explained that "[i]n a different case, where there was evidence that police chose in bad faith not to perform DNA tests that they believed would be exculpatory, the court might inquire more deeply into what the Constitution requires."  *Id.* at *4.  Construing Plaintiff's opposition as a motion to amend and considering the request in conjunction with the TAC allegations that Officer Tirapelli "acted with malice because he knew that [there] existed exculpatory DNA evidence" (Dkt. No. 44 ¶ 32), Plaintiff's proposed amendment presents the bad faith situation that the *Nicolaas* court envisioned might be a constitutional violation.  Accordingly, viewing the proposed amendment with extreme liberality, *see Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990), and accepting Plaintiff's allegations as true, the Court cannot say that leave to amend would be futile.  Thus, despite the undue delay and Plaintiff's failure to raise this claim in any of the three amended complaints, the Court will construe Plaintiff's opposition as a motion for leave to amend the TAC and consider the due process claim below.

   B.   *Officer Tirapelli is Entitled to Summary Judgment*

Assuming without deciding that *Youngblood* and *Nicolaas* can be read to create a right to pretrial DNA testing, Officer Tirapelli is nevertheless entitled to qualified immunity, which shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*).

To determine whether qualified immunity applies, the Court decides whether "(1) the officer's conduct violated a constitutional right; and (2) the right which was violated was clearly established at the time of the violation."  *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010).  The Supreme Court has instructed that district courts may "exercise their

12

United States District Court
Northern District of California

1    sound discretion in deciding which of the two prongs of the qualified immunity analysis should be

2    addressed first." *Pearson*, 555 U.S. at 236.  The officer is entitled to immunity if he did not

3    violate a constitutional right or if he violated a constitutional right that was not clearly established.

4    *Id.*

5         "[C]learly established law [is not to be defined] at a high level of generality." *Ashcroft v.*

6    *al-Kidd*, 563 U.S. 731, 742 (2011).  Instead, in deciding whether a constitutional right was clearly

7    established at the time of the alleged violation, a court must ask "whether the violative nature of

8    *particular conduct* is clearly established." *Id.* (emphasis added).  "The plaintiff bears the burden

9    to show that the contours of the right were clearly established." *Clairmont v. Sound Mental*

10   *Health*, 632 F.3d 1091, 1109 (9th Cir. 2011).  "This inquiry, it is vital to note, must be undertaken

11   in light of the *specific context* of the case, not as a broad general proposition." *Saucier v. Katz*,

12   533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 236.  In making

13   this determination, courts consider the state of the law at the time of the alleged violation and the

14   information that the official possessed to determine whether a reasonable official in a particular

15   factual situation should have been on notice that his or her conduct was illegal.  *Inouye v. Kemna*,

16   504 F.3d 705, 712 (9th Cir. 2007).  "[W]here there is no case directly on point, 'existing precedent

17   must have placed the statutory or constitutional question beyond debate.'" *C.B. v. City of Sonora*,

18   769 F.3d 1005, 1026 (9th Cir. 2014) (citation omitted).  An official's subjective beliefs are

19   irrelevant.  *Inouye*, 504 F.3d at 712.

20        Here, Plaintiff has not established that Officer Tirapelli violated his right to due process by

21   delaying DNA testing of the evidence from the BMW.  First, Plaintiff has not identified exactly

22   what the violation is.  Is it failing to test the DNA immediately?  Failing to test it within a certain

23   number of months after Plaintiff's arrest?  Failing to have the results of the DNA testing returned

24   before Plaintiff's preliminary hearing?  Whatever the timing, even if a due process right to pretrial

25   DNA testing exists, Plaintiff has failed to adduce evidence from which a reasonable trier of fact

26   could conclude that Officer Tirapelli acted in bad faith in delaying the DNA testing and thus that

27   Officer Tirapelli violated his right.  *See Youngblood*, 488 U.S. at 58; *Nicolaas*, 2013 WL 4519603,

28   at *4.

United States District Court
Northern District of California

1    Plaintiff argues that Officer Tirapelli is liable because he "had knowledge of the apparent

2  exculpatory value of th[e DNA] evidence" because Defendant repeatedly told him he was not the

3  driver.  (Dkt. No. 70 at 5.)  In *Nicolaas*, the court held that a positive eyewitness identification was

4  enough to prosecute the plaintiff, so it was not bad faith for the police to fail to test DNA evidence

5  to corroborate the identification.  2015 WL 4519603, at *4.  So too here, where the prosecution

6  was based on more than the identification alone: putting aside Officer Deise's identification,

7  which will be discussed in more detail below, Plaintiff was arrested based on Officer Deise's

8  observation of him fleeing the car, his concession that he was in the car, his statement that his

9  glasses were in the car, and the discovery of his glasses on the driver's seat.  Thus, Officer

10  Tirapelli had more than the identification alone to place Plaintiff in the driver's seat.  Like

11  *Nicolaas*, "[i]t is regrettable that [the] identification was mistaken, but [the] identification was

12  more than sufficient grounds to prosecute [Plaintiff,]" 2015 WL 4519603, at *4, so the failure to

13  immediately seek DNA testing to corroborate the identification was not bad faith.

14    Moreover, Officer Tirapelli testified that he acted in accordance with his usual protocol for

15  testing DNA evidence in this type of case—that is, he waited until the DA requested DNA

16  analysis.  He further testified that he submitted requests for analysis as soon as the DA requested

17  them, which occurred seven months into Plaintiff's case.  Plaintiff has not offered any evidence

18  showing that Officer Tirapelli purposefully delayed the submission once the DA requested testing,

19  hid the results from the DA once they were returned, or otherwise engaged in bad faith by

20  purposefully delaying testing.  All Plaintiff relies on is his statements to the arresting officer and

21  Officer Tirapelli that he was not the driver.  While there is no factual dispute that Plaintiff made

22  such statements, a reasonable trier of fact could not find bad faith based on the statements alone;

23  such a theory of bad faith would establish a constitutional right to DNA testing whenever a

24  criminal defendant protests his innocence.  To do so would be contrary to the well-established

25  precedent that police have no constitutional duty to perform any particular tests and goes far

26  beyond the recognized right to be free from bad faith destruction of evidence.  *Youngblood*, 488

27  U.S. at 59.  Plaintiff's failure to establish that Officer Tirapelli acted in bad faith is fatal to his due

28  process claim.

United States District Court
Northern District of California

1    Moreover, even if Plaintiff had established a constitutional violation, he fails to show that

2    the right he invokes was clearly established in "the specific context of [this] case[,]" *Saucier*, 533

3    U.S. at 201—that a reasonable official would have understood that his conduct violated those

4    rights. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Plaintiff identifies no precedent clearly

5    establishing a right to pretrial DNA testing, let alone pretrial DNA testing within a certain number

6    of months of pretrial detention or prior to the preliminary hearing.  In fact, Plaintiff does not cite a

7    single case about delayed testing in his opposition to Defendants' qualified immunity argument,

8    instead relying on *California v. Trombetta*, 467 U.S. 479, 489 (1984) and *United States v. Cooper*,

9    983 F.2d 928 (9th Cir. 1993)—both cases involving destruction of evidence altogether before trial.

10   Nor did Plaintiff identify any authority at oral argument.  As discussed above in the context of

11   whether leave to amend would be futile, the only case to have touched on this issue is *Nicolaas*, a

12   district court case that expressed doubt about whether the right exists at all even when there is bad

13   faith.  Thus, it would not be clear to a reasonable officer in Officer Tirapelli's position that his

14   failure to submit the evidence for DNA testing until the DA requested it months after Plaintiff's

15   arrest would be unlawful.

16   Because Plaintiff cannot show that he had a clearly established right to have DNA

17   evidence tested at some earlier point in time, Officer Tirapelli is entitled to qualified immunity on

18   Plaintiff's Section 1983 claim against him.  *See Nicolaas*, 2013 WL 4519603, at *5 (granting

19   summary judgment to the defendant officers who were only sued in their official capacity and

20   noting that the same result would follow if they were sued in their personal capacity because even

21   if the plaintiff "had a constitutional right to pretrial DNA testing, that right was not clearly

22   established").

23   **III.    Malicious Prosecution Claim against Defendant Deise**

24   The elements of a malicious prosecution claim brought under Section 1983 incorporate

25   state law.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561-62 (9th Cir. 1987).  Under

26   California malicious prosecution law Plaintiff must prove that the underlying prosecution: "(1)

27   was commenced by or at the direction of the defendant and was pursued to a legal termination in

28   his, plaintiff's, favor; (2) was brought without probable cause; and (3) was initiated with malice."

15

1  *Conrad v. United States*, 447 F.3d 760, 767 (9th Cir. 2006); *see also Yousefian v. City of*

2  *Glendale*, 779 F.3d 1010, 1014 ("The absence of probable cause is a necessary element of § 1983

3  false arrest and malicious prosecution claims.") (citations omitted).  In addition, Plaintiff must

4  overcome the presumption that the prosecutor exercised independent judgment in prosecuting the

5  charge; "[i]n the absence of evidence to rebut the presumption, the presumption [is] sufficient to

6  require summary judgment." *Smiddy v. Varney*, 803 F.2d 1469, 1471 (9th Cir. 1986) ("*Smiddy*

7  *II*").

8  The criminal action was indisputably resolved in Plaintiff's favor.  And for purposes of this

9  motion the Court will assume the evidence is sufficient to support a finding of malice.  The

10  malicious prosecution claim nevertheless fails because Defendants have established as a matter of

11  law that there was probable cause and, even if that were not the case, it is reasonably arguable that

12  there was probable cause, which is sufficient for qualified immunity.

13  1.  *Probable Cause*

14  "If the court determines that there was probable cause to institute the prior action, the

15  malicious prosecution action fails, whether or not there is evidence that the prior suit was

16  maliciously motivated." *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal. 3d 863, 875 (1989); *see*

17  *also Smith v. Almada*, 640 F.3d 931, 944 (9th Cir. 2001) ("[P]robable cause is an absolute defense

18  to malicious prosecution.") (citation omitted).  When the claim is based on a criminal prosecution,

19  "the question of probable cause is whether it was objectively reasonable for the defendant to

20  suspect the plaintiff had committed a crime." *Johnson v. Ralphs Grocery Co.*, 204 Cal. App. 4th

21  1097, 1105-06 (2012) (citations omitted).  "Subjective intentions play no role in ordinary,

22  probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996).

23  Instead, the inquiry turns on whether "facts and circumstances within the officer's knowledge [ ]

24  are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the

25  circumstances shown, that the suspect has committed, is committing, or is about to commit an

26  offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  Put another way, there is probable

27  cause for the initiation of a criminal prosecution if "it was objectively reasonable for the defendant

28  to suspect the plaintiff had committed a crime." *Roberts v. McAfee, Inc.*, 600 F.3d 1156, 1164

United States District Court
Northern District of California

16

1    (9th Cir. 2011) (citation omitted).

2           "What facts the defendant knew is an issue of fact for the jury, but only to the extent the

3    scope of the defendant's knowledge is disputed."  *Roberts*, 660 F.3d at 1164.  When the state of

4    the defendant's knowledge is "undisputed, it is the court which decides whether such facts

5    constitute probable cause or not."  *Sheldon Appel Co.*, 47 Cal. 3d at 881; *see also Roberts*, 660

6    F.3d at 1164 ("Whether probable cause existed on the facts known to the defendant is a question

7    of law for the court[.]") (citation omitted).

8           Here, Plaintiff—who carries the burden of proof—argues that there are factual disputes

9    that preclude summary judgment on the existence of probable cause.  But there are either no such

10   disputes or, to the extent that there are, the evidence, even when construed in Plaintiff's favor, is

11   insufficient to negate probable cause.  As discussed below, the Court concludes, as a matter of

12   law, that even absent Officer Deise's observations of the BMW driver on 90th Avenue, there was

13   sufficient probable cause to believe that Plaintiff was the driver for the criminal prosecution

14   against Plaintiff to be initiated and maintained after his arrest.

15          First, as noted above, the Court assumes for the purposes of this motion that Plaintiff was

16   not driving the BMW and instead was asleep in the passenger seat, as he testified.  A reasonable

17   inference to draw from this testimony is that Officer Deise falsely stated that he observed Plaintiff

18   in the driver's seat.  In the context of cases alleging false arrest in which an arrest warrant was

19   issued, the Ninth Circuit has held that an officer's false statements in a warrant application are

20   immaterial to the probable cause analysis if other evidence, without the false statement, is

21   sufficient to establish probable cause to issue the warrant.  *See Smith v. Almada*, 640 F.3d 931,

22   937-38 (9th Cir. 2011) (rejecting the plaintiff's claim that an officer's false statements caused

23   malicious prosecution because "even after correcting for the allegedly false and omitted

24   information[,] . . . probable cause supported [plaintiff's] arrest . . . [and] prosecution") (citations

25   omitted); *see also Ewing v. City of Stockton*, 588 F.3d 1218, 1224-25 (9th Cir. 2009) (concluding

26   that an officer's false statements in a warrant application about the plaintiff were not material

27   because there was other evidence sufficient to establish probable cause); *Lombardi v. City of El

28   Cajon*, 117 F.3d 1117, 1126-27 (9th Cir. 1997) (concluding that an officer's omissions in a

warrant application were not material because there was other evidence sufficient to establish probable cause).  Materiality is a question for the court, and in that context "requires the plaintiff to demonstrate that the magistrate judge would not have issued the warrant with false information redacted, or omitted information restored."  *See Smith*, 640 F.3d at 937 (internal quotation marks and citation omitted).  The same reasoning applies to the probable cause analysis in the malicious prosecution context, as the standard for probable cause is the same in both scenarios.  *See, e.g.*, *Scotti v. City of Phoenix*, 609 F. App'x 386, 387-88 (9th Cir. 2015) (affirming the district court's grant of summary judgment to defendant officer on a malicious prosecution claim because "probable cause—independent of the false information conveyed by [the arresting officer]— supported [plaintiff's] arrest and prosecution.") (citation omitted).  Thus, the Court assumes that the identification is false and considers whether independent information available to the arresting officer supports probable cause as a matter of law.[5]  It does.

　　　Even absent the identification—that is, even if the arresting officer did not have an opportunity to observe who was in the driver's seat—there is no genuine dispute that the totality of the evidence available to the arresting officer would lead a prudent person to conclude that there was a fair probability that Plaintiff was driving the BMW based on the following undisputed facts: (1) the officer observed two men running away from the car; (2) Plaintiff was running away from the driver's side of the car; (3) Plaintiff admitted to being in the car; and (4) Plaintiff's glasses were found on the driver's seat of the car.  These facts are more than sufficient to lead a person of reasonable caution to believe that Plaintiff was driving the BMW and thus to find probable cause for his arrest on the driving-related offenses.  *See People v. Windham*, 194 Cal. App. 3d 1580, 1589 (1987) (noting that there was probable cause to believe the defendant was driving the car and arrest him for driving-related offenses where there was no one else in the area, the driver's seat was empty, and the officer observed the defendant standing 15 to 20 feet away even though the

---

[5] Because the Court does not consider Officer Deise's identification in determining the existence of probable cause, the Court need not consider the other evidence Plaintiff offered to support his position that Officer Deise could not have observed the BMW driver—*i.e.*, the O'Brien Declaration.  The Court therefore overrules as moot Officer Deise's evidentiary objection to the declaration.  (Dkt. No. 74 at 7-11.)

United States District Court
Northern District of California

1  arresting officers never observed the defendant in the car); *Noia v. Cozens*, 34 Cal. App. 3d 691,

2  694 (1973) (noting that there was probable cause to believe the defendant was driving the car and

3  arrest him for driving-related offenses based on circumstantial evidence even though the arresting

4  officer never observed the defendant in the car); *see also People v. Thompson*, 38 Cal. 4th 811,

5  820 (2006) (holding that officers' lack of certainty that the defendant was the driver did not

6  preclude a finding of probable cause where an eyewitness gave a vague description of the suspect

7  but the car was traced to a particular address where a man matching the description attempted to

8  flee from the house when the police arrived).  This is especially true given that flight is evidence

9  of wrongdoing, and it is undisputed that Plaintiff fled the vehicle after the crash.  *See United States*

10  *v. Fuentes*, 105 F.3d 487, 490 (9th Cir. 1997) ("Flight together with other evidence g[ives] rise to

11  probable cause.").

12      Plaintiff's arguments to the contrary are unavailing.  The Court asked the parties to address

13  in supplemental briefing whether absent Officer Deise's observation of the driver, there was

14  sufficient probable cause to believe that Plaintiff was the driver of the car.  In his submission,

15  Plaintiff appears to contend that there is only probable cause to believe someone is the driver when

16  the arresting officer observes the person seated in the driver's seat.  (*See* Dkt. No. 77 at 3-5

17  (citations omitted).)  As the above-cited cases make clear, such is not the case.  *See Windham*, 194

18  Cal. App. 3d at 1589; *Noia*, 34 Cal. App. 3d at 694; *Thompson*, 38 Cal. 4th at 820.  The authorities

19  Plaintiff cites do not hold otherwise.  While the cases on which he relies hold that observations of

20  an individual in the driver's seat of a parked car are enough to find probable cause that the person

21  had been driving because the state vehicle code defines "driver" broadly to include "a person who

22  drives *or is in actual physical control of* a vehicle," Cal. Vehicle Code § 305 (emphasis added),

23  they do not hold that observations of the driver are required.  *See Adler v. Dep't of Motor Vehicles*,

24  228 Cal. App. 3d 252, 258 (1991); *Loharsingh v. City & Cnty. of San Francisco*, 696 F. Supp. 2d

25  1080, 1101 (N.D. Cal. 2010).[6]

26      At oral argument, Plaintiff urged that his glasses being found on the driver's seat cannot

27

28  _____

[6] *Adler* and *Loharsingh* are inapposite, as there it was undisputed that the plaintiffs were in the driver's seat and the only dispute was whether they had been driving.  The opposite is true here.

19

contribute to probable cause because the car had just been in a major collision, so the glasses could have been thrown onto the driver's seat from anywhere in the car.  He repeats and readjusts that argument in his supplemental brief, contending that a reasonable officer in Defendant's position also would have reasoned that the glasses fell as Plaintiff exited the car.  (*See* Dkt. No. 77 at 4-6.)  There, he suggests that absent Officer Deise's false observation of the driver on 90th Avenue, the *only* evidence available to the arresting officer would be "the mere discovery of Plaintiff's glasses on the driver's seat" and contends that that alone is not enough to indicate that he was the driver. (*Id.* at 5-6.)  Taking the argument a step further, he contends that "[i]f such reasoning were allowed, then anyone who inadvertently dropped their property on the driver's seat of a vehicle . . . could be held accountable for being the driver . . . ."  (Dkt. No. 77 at 6.)

But here the glasses were not the only evidence available to the arresting officer.  There was also Plaintiff's admission that he was in the car, the officer's observation of Plaintiff fleeing the car on the driver's side, and Plaintiff's admission that the glasses were his.  For the reasons described above, this is enough circumstantial evidence for a reasonable officer to believe that Plaintiff was the driver.  At oral argument, Plaintiff likewise insisted that there was no probable cause because when the officers checked the car's registration, they saw that Plaintiff was not the owner of the car.  These facts may provide reasonable doubt about whether Plaintiff was the driver.  But they do not undermine probable cause: based on the two men running from the car, there was a 50% chance that Plaintiff was the driver; his glasses on the driver's seat tipped the scales to make it probable that Plaintiff was the driver.  "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment[,]" *Maryland v. Garrison*, 480 U.S. 79, 87 (1987), and these facts meet that standard.

Certainly, an officer may not ignore exculpatory evidence that would "negate a finding of probable cause."  *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003).  But Plaintiff has not identified any such evidence or circumstances that an officer would have seen at the time of the incident.  The mere existence of some evidence that *could* suggest Plaintiff was not the driver— namely, his repeated statements that he was not the driver—does not negate probable cause to believe he was.  To conclude otherwise would undermine probable cause whenever a defendant

20

protested his innocence.  No reasonable jury could conclude that the facts known to an arresting officer—based on observations of the men fleeing the car and Plaintiff's statements—were insufficient to establish probable cause.

Moreover, the Superior Court judge held Plaintiff to answer following his preliminary hearing, which constitutes "prima facie—but not conclusive—evidence of probable cause." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (emphasis omitted).  Plaintiff can rebut a *prima facie* finding of probable cause "by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith."  *Id.* (citations omitted).  Plaintiff argues that Officer Deise's fabricated observation and identification of him rebuts the *prima facie* showing of probable cause.  But at the preliminary hearing, the Superior Court judge noted that there were reasons to question the accuracy of the officer's identification given the short time he had to observe the driver and other inconsistencies, but nevertheless bound Plaintiff over for trial concluding there was probable cause to believe he was the driver based on the totality of the evidence.  (Dkt. No. 65-6 at 10-11.)  Thus, here too the conclusion that there was probable cause stands independently from Officer Deise's fabricated identification, so Plaintiff has failed to establish a triable issue as to the absence of probable cause.

The inquiry could end here, as summary judgment is proper based on Plaintiff's inability to establish a lack of probable cause for his arrest on the driving-related charges.  *See Yousefian*, 779 F.3d at 1015 (affirming summary judgment and, accordingly, declining to decide whether the magistrate's probable cause determination at the preliminary hearing estopped re-litigation of the issue or whether the prosecutor exercised independent judgment in filing the charges).

### 3.  *Qualified Immunity*

Although Officer Deise did not argue in his opening brief that he was entitled to qualified immunity on this claim, he did so in his supplemental brief and the Plaintiff had an opportunity to respond, so the Court addresses the argument here.  The question is "whether it is *reasonably arguable* that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity."  *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (emphasis in

United States District Court
Northern District of California

original) (citation omitted); *accord Sialoi v. City of San Diego*, 823 F.3d 1223, 1233 (9th Cir. 2016) (citation omitted).  Thus, "[e]ven if the arrest was made without a warrant and without probable cause . . . the officer may still be immune from suit if it was objectively reasonable for him to *believe* that he had probable cause." *Rosenbaum*, 663 F.3d at 1078 (emphasis in original) (citation omitted); *see, e.g.*, *Eberhard v. Cal. Highway Patrol*, No. 3:14-cv-01910-JD, 2015 WL 6871750, at *4 (N.D. Cal. Nov. 9, 2015) (granting summary judgment to the arresting officers on plaintiff's claim for unlawful arrest because the officers reasonably believed there was probable cause for his arrest).  This standard is difficult to detangle from the probable cause inquiry, which itself turns on whether the circumstances would lead a reasonable officer to conclude that the suspect has committed a crime; the difference is that the probable cause inquiry is about whether the officer's belief is "objectively reasonable," *Roberts*, 600 F.3d at 1164, whereas in the qualified immunity context it need only be "reasonably arguable" that the officer has that objective belief, *Rosenbaum*, 663 F.3d at 1076.

Even viewed most favorably to Plaintiff, given the undisputed facts that the arresting officer saw Plaintiff fleeing from the driver's side of the car, his admission that he was in the car, and his glasses were found on the driver's seat, Officer Deise meets this standard: it is *reasonably arguable* that there was probable cause to believe he was the driver.  Put another way, even if there was a question about why Plaintiff was running from the driver's side of the car and how his glasses ended up on the seat, and even if there were an innocent explanation for those facts, the circumstances still make it reasonably arguable that a reasonable officer in Officer Deise's position would have believed that Plaintiff was the driver.  Plaintiff's sole argument in opposition to qualified immunity is a non-starter: he contends that it is "clearly established well before 2012 that a party is not a 'driver' of a vehicle unless they are driving the vehicle" and that "there mere location of someone's personal property located inside a vehicle does not in and of itself lend to reasoning that the person is the driver . . . ." (Dkt. No. 77 at 10.)  But Officer Deise, and a reasonable person in his position, was not faced only with personal property on the driver's seat. Instead, Plaintiff's glasses on the driver's seat, flight from the driver's side of the vehicle, and admission that he was in the car combined to make it reasonably arguable for the arresting officer

United States District Court
Northern District of California

United States District Court
Northern District of California

1    to believe he was the driver.

2         For each of these reasons, Officer Deise is entitled to summary judgment.

3                                    **CONCLUSION**

4         For the reasons described above, the Court GRANTS Defendants' motions for summary

5    judgment as follows.  First, based on Plaintiff's withdrawal, the Court dismisses the false arrest

6    claim against Officer Deise, the malicious prosecution claim against Officer Tirapelli, and the

7    municipal liability claim against the City of Oakland.  As there are no remaining claims against

8    the City of Oakland, the Court DISMISSES the City of Oakland from this action.

9         As to the remaining claims, Officer Tirapelli is entitled to summary judgment on the

10   failure to test exculpatory DNA evidence claim—which the Court considers construing Plaintiff's

11   opposition as a request to amend the complaint—on qualified immunity grounds.  Officer Deise is

12   likewise entitled to summary judgment on the malicious prosecution claim.  The Court will enter a

13   separate judgment.

14        This Order disposes of Docket Nos. 64 and 69.

15        **IT IS SO ORDERED.**

16   Dated: March 16, 2017

17

18                                              _____

19                                              JACQUELINE SCOTT CORLEY
                                                United States Magistrate Judge

20

21

22

23

24

25

26

27

28